UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
ALEX A., A Minor, by          :
PAMELA A., His Parent and     :
Next Friend,                  :
               Plaintiff,     :
                              :
     v.                       :          CA 09-227 ML
                              :
LINCOLN SCHOOL COMMITTEE and  :
JOHN WARD, in his official    :
capacity as Finance Director  :
for the Town of Lincoln,      :
               Defendants.    :
```

## REPORT AND RECOMMENDATION

David L. Martin, United States Magistrate Judge

Before the Court are cross motions for summary judgment:
Defendants' Motion for Summary Judgment and Request for an
Expedited Decision (Document ("Doc.") #9) ("Defendants' Motion
for Summary Judgment" or "Defendants' Motion") and Plaintiff's
Motion for Summary Judgment and Plaintiff's Motion in Opposition
to Defendants' Motion for Summary Judgment (Doc. #18)
("Plaintiff's Motion for Summary Judgment" or "Plaintiff's
Motion") (collectively the "Motions").  The Motions are directed
to Count 1 of the Complaint (Doc. #1).  In Count 1, Plaintiff
Alex A. ("Alex"), through his parent and next friend, Pamela A.
("Parent," "Pamela," or "Alex's mother") (collectively
"Plaintiff"), seeks judicial review of a decision by an impartial
due process hearing officer which found that Defendant Lincoln
School Committee's recommended placement of Alex at the Bradley

Hospital Day School constituted a "free appropriate public education ["FAPE"]," 20 U.S.C. § 1412(a)(1)(A).[1]  See Complaint ¶¶ 1, 15, 67-69; see also 1/11/10 Hearing Exhibit ("Ex.") 1 (Impartial Due Process Hearing Officer's April 15, 2009, Decision ("Decision")).  Plaintiff additionally seeks review of the hearing officer's denial of Parent's complaint for home tutoring.[2]  See Complaint ¶ 70; see also Decision at 19.

    This matter has been referred to me for preliminary review,

---

[1] The Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. §§ 1400-1487, guarantees disabled children between the ages of three and twenty-one, see id. § 1412(a)(1)(A), access to a "free appropriate public education ["FAPE"]," id.; see also id. § 1400(d)(1)(A).  "[T]he 'free appropriate public education' ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'"  Roland M. v. Concord Sch. Comm., 910 F.2d 983, 987 (1st Cir. 1990)(quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 203, 102 S.Ct. 3034 (1982)).

[2] Counts 2 through 5 of the Complaint (Doc. #1) allege that Defendants discriminated against Alex because of his disabilities by not properly transitioning him into the sixth grade, by having an illegal Individualized Education Program ("IEP") meeting, by not including Parent in the development of some transition plan, and by placing Alex in an inappropriate placement.  See Complaint ¶¶ 75, 80, 85, 90.  The Complaint alleges that these actions constituted a municipal policy or practice that was the proximate cause of the violation of Plaintiff's rights under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq. (Count 2); Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq. (Count 3); and Title III of the ADA, 42 U.S.C. § 12181 et seq. (Count 4).  See Complaint ¶¶ 76, 81, 86.  Plaintiff seeks relief for each of these violations under 42 U.S.C. § 1983 (Counts 2-4).  See id. ¶¶ 76, 81, 86.  The Complaint additionally alleges that the violations claimed in Counts 2 through 4 pursuant to § 504 and Titles II and III of the ADA are also a violation of R.I. Gen. Laws § 42-87 (Count 5).  See id. ¶¶ 89-90.  Lastly, the Complaint alleges that Defendants breached a settlement agreement, which they had entered into on May 21, 2008, by not properly transitioning Alex to the sixth grade as required by the agreement (Count 6).  See id. ¶¶ 93-94.

findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  A hearing was held on January 11, 2010.  For the reasons stated below, I recommend that Defendants' Motion for Summary Judgment be granted and that Plaintiff's Motion for Summary Judgment be denied.

## I.  Facts

Alex was born in 1997.  <u>See</u> Impartial Due Process Hearing ("IDP Hearing") Joint Ex. 42 at 1.  He was able to attend school in Lincoln from kindergarten to some point in the third grade successfully.  Plaintiff's Statement of Undisputed Facts (Doc. #19) ("PSUF") ¶ 54.  Thereafter, however, Alex began to develop a resistance to attending school.  Decision at 3.  By the fifth grade Alex was barely attending school, and the Lincoln School Department (the "School Department") commenced a truancy action. <u>Id.</u>  That action was dismissed.  <u>Id.</u>

On or about October 24, 2007, the School Department filed a request for a due process hearing, seeking a finding that the placement proposed by the School Department and the Individualized Education Program ("IEP") Team for Alex was appropriate and constituted a FAPE in the least restrictive environment.  <u>Lincoln Sch. Comm. v. Pamela A., as parent and next friend of A.A., alias</u>, CA 08-80 S ("CA 08-80 S"), Complaint ¶ 6. At a pre-hearing conference, the parties agreed in principle to the terms of a settlement agreement and consent order.  <u>Id.</u> ¶ 7.

3

However, differences subsequently arouse between the School Department and Plaintiff regarding implementation and/or compliance with this settlement agreement, and both parties filed lawsuits.  See CA 08-80 S; <u>Alexander A., by and through his parent and next friend, Pamela A. v. Lincoln School Dep.'t</u>, No. 08-1295 (R.I. Super. Ct. 2008).  These lawsuits were resolved by the execution of another settlement agreement and consent order.  <u>See</u> IDP Hearing Joint Ex. 4 (Settlement Agreement and Consent Order ("Settlement Agreement")).

Pursuant to the Settlement Agreement, the parties agreed that Dr. Terry Harrison Goldman ("Dr. Harrison Goldman")[3] was an expert relative to Asperger's Syndrome[4] and further agreed that Dr. Harrison Goldman would do a number of things, including but not limited to meeting with Alex and his Parent, personally observing certain classrooms at the Lincoln Middle School

---

[3] Dr. Harrison Goldman is a clinical neuropsychologist and the director of Neuropsychological & Educational Services, Inc., in Providence, Rhode Island.  <u>See</u> Impartial Due Process Hearing ("IDP Hearing") Joint Ex. A (Letter from Dr. Harrison Goldman "To All Interested Parties" of 8/8/08) at 3; <u>see also</u> IDP Hearing Joint Ex. 44 (Curriculum Vita of Terry Harrison Goldman).

[4] Alex has the diagnosis of Asperger's Syndrome.  <u>See</u> Plaintiff's Statement of Disputed Facts (Doc. #17) ("PSDF") ¶ 1.  His pediatric neurologist, Dr. Maria Younes ("Dr. Younes"), testified to this at the IDP Hearing:

> He has the diagnosis of Asperger's Syndrome.  Under the umbrella of Asperger's Syndrome, he has a generalized anxiety disorder, and he has OCD, obsessive compulsive tendencies, and he has sensory integration issues, he has significant gross motor developmental delays, and fine motor delays.

Transcript of IDP Hearing ("Tr.") 3/27/09 at 6.

("Middle School"), reviewing pertinent records, and meeting school staff.  Defendants' Statement of Undisputed Facts (Doc. #10) ("DSUF") ¶ 4.

After being provided with a copy of the Settlement Agreement, Dr. Harrison Goldman made unannounced visits to the Middle School to observe certain classrooms.  Id. ¶ 5.  Following her viewing of the classrooms, she issued a letter stating that she thought Alex should be placed in the Learning Beyond Grade Level program ("LBGL program").  Id. ¶ 6.  The LBGL program is for an elective group of students who learn beyond grade level. Id. ¶ 7.  They must qualify through testing and teacher recommendations.  Id.  The placement in the LBGL program was requested by Parent and Alex's pediatric neurologist, Dr. Maria Younes ("Dr. Younes").  Id. ¶ 8.  In her letter, Dr. Harrison Goldman recommended that Alex's peer buddy be placed in the LBGL program.  Id. ¶ 9.  After receiving this letter, the School Department took steps to ensure that both Alex and his peer buddy were placed in the LBGL program despite the fact that neither qualified for the program.[5]  Id. ¶ 11.

---

[5] Plaintiff disputes this fact by stating that the School Department "did not place Alex's peer buddy in the classroom until the Transition Meeting on August 27, 2008, which was 19 days after Dr. Harrison-Goldman had written [her letter of August 8, 2008, "To All Interested Parties," IDP Hearing Joint Ex. A]."  PSDF ¶ 11 (citing Tr. 3/4/09 at 45, 50).  However, this statement does not contradict DSUF ¶ 11.  In addition, as explained hereafter, whether the School Department breached the Settlement Agreement is not an issue with respect to the instant Motions.  See Section V. B. 1 infra at 21-22.

In her letter Dr. Harrison Goldman also recommended that
Alex's previous teaching assistant, Marlene Bettencourt ("Ms.
Bettencourt"), would be the person best suited to meet his
educational needs.  Id. ¶ 10; see also IDP Hearing Joint Ex. A
(Letter from Dr. Harrison Goldman "To All Interested Parties" of
8/8/08) at 2.  However, Dr. Harrison Goldman subsequently
testified that she relied upon inaccurate information when she
made this recommendation.  DSUF ¶ 12.  Specifically, Dr. Harrison
Goldman testified that she had been informed initially by Parent
that Ms. Bettencourt had a long history with Alex and had
recommended Ms. Bettencourt in order to maintain continuity.  Id.
¶ 13.  However, Dr. Harrison Goldman further testified that she
later learned that Ms. Bettencourt had only worked with Alex for
eight days, id., that she did not have a "school relationship"
with him, id. ¶ 14, and that she did not want the position, id.[6]

On August 27, 2008, prior to the start of school, Dr.
Harrison Goldman held a transition meeting with Parent and school
staff.  Id. ¶ 15.  At that meeting, the parties discussed the
transition, the teaching[7] assistant, lunch procedure, seating

---

[6] Plaintiff notes that Ms. Bettencourt did not testify at the IDP
Hearing and that DSUF ¶ 14 "is simply what Dr. Harrison Goldman
testified Ms. Bettencourt allegedly told her."  PSDF ¶ 14.  However,
Plaintiff points to no evidence in the record which contradicts DSUF ¶
14.

[7] Defendants use the term "teacher assistant."  DSUF ¶ 16.
However, teaching assistant Linda Varone ("Ms. Varone") testified that
she is a "[c]ertified teaching assistant."  Tr. 3/5/09 at 33.

assignments, etc.  Id. ¶ 16.  The following day, Alex' teaching
assistant, the principal, the school social worker[8] (Loretta
Jones ("Ms. Jones")), the diagnostic prescriptive teacher[9]
(Barbara Maher ("Ms. Maher")), the peer buddy, and the peer
buddy's mother met with Alex and Parent.  Id. ¶ 17.  For some
unknown reason, it appeared that Alex had not been told about his
teaching assistant despite the fact that Parent had known her
identity for over a month.  Id. ¶ 18.

On the first day of school, several members of the School
Department, including the director of special services[10] (Mary
Ann Struble ("Ms. Struble")), the principal ("Mr. Macksound"),
and Ms. Maher, monitored Alex to see how he was doing.  See Tr.
3/4/09 at 58.  Alex was also observed by his teaching assistant
(Linda Varone ("Ms. Varone")).  See Tr. 3/5/09 at 41-42.  Ms.
Struble, Ms. Maher, and Ms. Varone all testified that when they

---

[8] The school social worker (Loretta Jones ("Ms. Jones"))
described her role with respect to Alex as: "I'm interested in his
emotional well-being, emotional social status when he's in the
building, helping him to transition into the school."  Tr. 3/5/09 at
46.

[9] A diagnostic prescriptive teacher is a teacher who assists in
developing and supporting children with special educational needs.
Tr. 3/4/09 at 24.  Such teachers do "testing to determine eligibility,
academic teaching, observations and support to classrooms."  Id.; see
also Tr. 3/11/09 at 21-23 (Ms. Maher describing her job as a
diagnostic prescriptive teacher).

[10] The director of special services oversees programing for all
students who are provided service through special education and IEPs.
Tr. 3/4/09 at 25.  The director "monitor[s] 504s, and ... develop[s]
programs in professional development as needed to treat the individual
needs of the children ...."  Id. at 25-26.

observed Alex during the day he appeared to be doing fine.  See
Tr. 3/4/09 at 58; Tr. 3/11/09 at 30-32; Tr. 3/5/09 at 41-42.
However, at the end of the day, when Ms. Maher saw Alex in his
mother's classroom,[11] he was "very agitated ... very upset ...
very, very unhappy and kind of distraught about the way the day
went."  Tr. 3/11/09 at 31.[12]

Parent testified that Alex was upset because he had been
placed in a physical education class with children who had very
significant physical handicaps and that "he had never seen
children that were so impaired."[13]  Tr. 3/11/09 at 92.  Parent
also testified that Alex's peer buddy had not been seated next to
him except in one class (and that only by happenstance), see id.,
and that Dr. Harrison Goldman had not come the first day as she
had promised, see id. at 93.

Although Alex came to school the next day with his uncle,
Richard Applebaum ("Mr. Applebaum"), to meet with Ms. Jones, he

---

[11] Alex's mother is a teacher and was teaching in the Middle
School in the fall of 2008.

[12] Ms. Varone recounted observing a similar change in Alex's
attitude.  See Tr. 3/5/09 at 41-42.  She testified that she and Alex
had had a discussion about how the day had gone, id. at 42, that he
had agreed with her that the day had gone "pretty well," id., and that
she had reported this to Alex's mother when she brought Alex to her at
the end of the day, see id.  However, when Alex's mother commented to
Alex about the day, he responded "we'll discuss it when we get home."
Id.  Ms. Varone testified that, from Alex's demeanor and tone, she did
not expect that he would be in school the next day.  Id.

[13] Parent testified that "[Alex] was left in that P.E. room with
the boy in the wheelchair and the stretcher, and he was scared because
he didn't know why he was there."  Tr. 3/11/09 at 92.

did not attend any classes.  DSUF ¶ 22.  Over the next several weeks, Alex only attended a total of fourteen days of school (some partial), despite multiple revisions of the transition plan and multiple meetings.  Id. ¶ 23.  During those fourteen days, there were one or two instances of misbehavior by Alex which involved writing on the wall, pushing papers onto the floor, throwing his backpack, and hitting his mother.[14]  Tr. 3/5/09 at 40; Tr. 3/11/09 at 44.

In an effort to ease Alex's anxiety, the School Department

---

[14] Plaintiff states that "Alex is not an aggressive child and does not have behavior problems."  PSDF ¶ 24 (citing, inter alia, Tr. 3/11/09 at 11).  It is true that Ms. Jones, when asked if she would characterize Alex as a violent student or a behavior issue, responded "No, not at all," Tr. 3/11/09 at 11, and that she described Alex as "a very nice young man, and he's always polite ...," id.  Yet, she testified to seeing some aggressive or out-of-the-ordinary behavior by him which she attributed to anxiety:

> [F]requently anxiety in a young adolescent can manifest itself in kind of aggressive or defiant ways, and I think that's what we were seeing when we saw it.  He would shove his books off the table.  He did throw some of mom's items off the table, and once he did slap mom.

Id.
Parent's testimony that she never heard that Alex was accused of slapping a teacher or another child, Tr. 3/12/09 at 45, does not directly contradict the testimony of Ms. Varone, Ms. Maher, and Ms. Jones, all of whom observed misbehavior by Alex.  Tr. 3/5/09 at 40; Tr. 3/11/09 at 44; Tr. 3/12/09 at 45.  Plaintiff states that "Parent denies Alex attempted to slap her," PSDF ¶ 24 (citing Tr. 3/11/09 at 90-92), although Parent appears to acknowledge that Alex "pushed the desk," Tr. 3/11/09 at 91.  Plaintiff also cites the testimony of Dr. Younes that "Alex, per se, is not a behavioral child."  Id. (citing Tr. 3/27/09 at 11).
To the extent that the evidence is in conflict on this issue, it does not affect the resolution of the instant Motions.  The Court does not find that behavior is a significant issue with Alex.  The Court only finds that there is evidence in the record that he has misbehaved in one or two instances.

allowed family members and friends to accompany Alex to school. DSUF ¶ 25.  Alex was provided with almost constant access to people with whom he was familiar – either his mother, family friend(s), advocates, Ms. Jones, or Ms. Maher.  Id. ¶ 26. Despite these efforts, Alex would not even attend his preferred class, social studies.  Id. ¶ 27.  Finally, matters reached the point where Alex could not physically enter a classroom.[15]  Id. At the IDP Hearing, both Dr. Harrison Goldman and Ms. Jones testified regarding Alex's absolute fear and inability to go into a classroom.  Id. ¶ 29.

Alex stopped coming to school entirely in November of 2008. Id. ¶ 31.  In October and November 2008, the IEP Team met on four occasions to finalize an IEP and to determine a placement since the Middle School was clearly not viable.  Id. ¶ 32.  After the IEP was completed, the team discussed Dr. Harrison Goldman's recommendation of a residential placement.  Id. ¶ 33 (citing IDP Hearing Joint Ex. 21).  Dr. Harrison Goldman testified that she recommended a residential placement because such a placement

---

[15] Dr. Harrison Goldman testified to observing one attempt by Alex to enter a classroom:

> Alex was trying very hard with a lot of support to get into a classroom where the other kids were present and he could see them, and he literally was walking towards, and the closer he got to the classroom, the slower he got, and as he got even closer, he backed up and moved away, and almost physically became in a ball and was unable to get within the classroom and went back to the library.

Tr. 3/5/09 at 81.

could provide the "intense therapeutic needs that [Alex] has,"
id. at 34, and the "constant attention on how to cope and deal
with the situation to get him past that, and then to move on and
transition him back to another type of less restrictive
environment," id.  The recommendation was supported by a
consensus of the IEP Team.  Id. ¶ 35.

Parent was greatly distressed by this recommendation, id. ¶
36, and testified that when she heard it she "almost had an
anxiety attack and was sick to her stomach," id. ¶ 37.  In an
effort to address Parent's concerns and also to meet Alex's
needs, the IEP Team discussed the possibility of a therapeutic
day placement as an alternative placement.  Id. ¶ 38.  The IEP
Team also felt that this alternative should be considered due to
the requirement to provide the least restrictive environment
given the disability.  Id. ¶ 39.  Although Dr. Harrison Goldman
still believed that a residential placement was appropriate, she
was "willing to go with the team ...," Tr. 3/5/09 at 83, and
agreed to support placement at the Bradley Hospital Day School
("Bradley"), id. at 84.  Parent, however, objected to this
placement.  Tr. 3/12/09 at 35-36, 46, 56.  She wanted the School
Department to consider placement at the Wolf School, the Hamilton
School, or St. Andrew's School ("St. Andrew's").  Tr. 3/4/09 at
88.  The School Department sent Alex's records to these schools.
Id.  St. Andrew's and the Hamilton School responded that they did

not believe that their programs were suitable for Alex.  Id. at
89.  The Wolf School did not have an opening in grade 6.  Id.

Several members of the IEP Team observed the program at
Bradley and spoke with its director.  DSUF ¶ 43.  This re-
enforced the team's belief that Bradley could provide the
required services for Alex.  Id. ¶ 44.  Based on all of the
information provided to the team in the form of evaluations, Dr.
Harrison Goldman's recommendations, and their personal
experiences and observations with Alex in 2008-2009, the
consensus of the IEP Team was that Alex should be placed at
Bradley where he could receive the appropriate services.  Id. ¶
45.[16]  It was the IEP Team's hope that Alex could learn

_____

[16] Plaintiff disputes DSUF ¶ 45, but the record supports
Defendants' position.  Tr. 3/4/09 at 73-74 (Ms. Struble testifying
that "the consensus of the team was that Alex needed the out-of-
district placement, and the placement would be Bradley"); Tr. 3/5/09
at 63 (Ms. Jones testifying that she supported the decision for
placement at Bradley and that no one at the meeting from the School
Department or Dr. Harrison Goldman voiced reservations about this
placement); Tr. 3/11/09 at 14 (Ms. Jones testifying that a consensus
of the IEP Team recommended Bradley as a placement); Tr. 3/5/09 at 84
(Dr. Harrison Goldman testifying that she supported "the team's
decision about the Bradley Day School"); Tr. 3/11/09 at 42 (Ms. Maher
testifying that "we were recommending the Bradley School" and stating
that no one "[o]utside of [Parent] and people that she brought with
her ...," disagreed with the decision to recommend placement at
Bradley).
    Although Plaintiff points to testimony by Alex's uncle that he
remembers Ms. Jones stating at the IEP Team meeting that Bradley was
not appropriate and that Ms. Maher was nodding in agreement with Ms.
Jones's statement, see PSDF ¶ 45, both Ms. Jones and Ms. Maher
testified that they supported the recommendation, see Tr. 3/5/09 at
62; Tr. 3/11/09 at 14; Tr. 3/11/09 at 42.  It is also true that Parent
and Ms. Toner-Walkden disputed that a decision regarding placement was
reached at the November 24 IEP meeting.  See Tr. 3/12/09 at 37; id. at
12.  However, these are credibility issues.  See Tr. 3/12/09 at 21
(overruling objection because "it goes to the credibility of the

strategies and techniques to address his school phobia so that he could be reintegrated into the least restrictive environment. DSUF ¶ 46.[17]

On December 8, 2008, Parent filed a letter requesting an impartial due process hearing with Defendants and the Rhode Island Department of Education.  Complaint ¶ 13.  The School Department offered tutoring to Alex at the school while the due process hearing was pending.  DSUF ¶ 47.  The location of the tutoring was critical because of Alex's school phobia.  Id. ¶ 48. Dr. Harrison Goldman testified that home tutoring was not appropriate for someone with school phobia.  Id. ¶ 49.  Despite the specific plan offered, Alex and/or Parent refused tutoring

---

witness" and allowing Mr. Applebaum to testify that he remembers Ms. Jones "stating that she didn't think Bradley would be a proper placement for Alex").  The Court sees no basis to substitute its judgment regarding credibility for that of the Hearing Officer who had the opportunity to see and hear the witnesses testify.  See Wagner v. Bd. of Educ. of Montgomery Cty., 340 F.Supp.2d 603, 611 (D. Md. 2004) ("(T)he fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility.").

[17] Plaintiff disputes DSUF ¶ 46, but Plaintiff's issue is not with the fact itself.  Rather, she contends that "no decision was made as to the specific placement at any IEP meeting."  PSDF ¶ 46.  However, both Ms. Maher and Ms. Jones testified that a decision was made at the November 24, 2008, IEP meeting to recommend placement at the Bradley Hospital Day School ("Bradley").  Tr. 3/11/09 at 42; Tr. 3/5/09 at 63. Dr. Harrison Goldman also testified that she believed that the IEP Team had recommended Bradley as the primary choice at the November 24, 2008, IEP meeting, although she allowed that she was "not sure if that was the final decision at that point."  Tr. 3/5/09 at 109.  Admittedly Parent and Kathie Toner-Walkden ("Ms. Toner-Walkden") testified that no decision regarding placement was reached at the meeting, Tr. 3/12/09 at 37; id. at 12, and Alex's uncle testified that "[t]here was no agreement about [Bradley being the proper placement] that I recall," id. at 20.  However, as previously noted, see n.16, credibility determinations are best left to the Hearing Officer.

because they wanted it to take place at home.  Id. ¶ 50.

## II.  Travel

On April 15, 2009, the IDP Hearing Officer issued her Decision, finding that Defendants' recommended placement of Alex at Bradley constituted a FAPE.  See Decision at 19.  Plaintiff on May 14, 2009, filed the Complaint in this Court which was answered by Defendants on June 3, 2009.  See Docket.  Defendants' Motion for Summary Judgment was filed on October 23, 2009, and Plaintiff's Motion for Summary Judgment was filed on December 1, 2009.  See id.  Oppositions to the respective Motions were filed by Plaintiff on November 30, 2009, and by Defendants on December 7, 2009.  See id.   The Court conducted a hearing on the Motions on January 11, 2010, and, thereafter, took the matters under advisement.  See id.

## III.  Standard of Review

Although a party in an Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1487, appeal may move for "summary judgment," the fact that a motion is so captioned does not mean that the court uses its normal summary judgment standard of review in which it examines whether genuine issues of material fact exist.  See Browell v. Lemahieu, 127 F.Supp.2d 1117, 1120 (D. Haw. 2000).  Rather, the Act provides that, when an action is brought in the District Court, the Court:

> (i)   shall receive the records of the administrative
>       proceedings;

    (ii)   shall hear additional evidence at the request of
           a party; and

    (iii)  basing its decision on the preponderance of the
           evidence, shall grant such relief as the court
           determines is appropriate.

20 U.S.C. § 1415(i)(2)(C)(i)-(iii); see also T.B. v. Warwick Sch.

Dep't, No. Civ.A. 01-122T, 2003 WL 22069432, at *6 (D.R.I. June

6, 2003).  "[T]he provision that a reviewing court base its

decision on the 'preponderance of the evidence' is by no means an

invitation to the courts to substitute their own notions of sound

educational policy for those of the school authorities which they

review."  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.,

Westchester County v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034

(1982).  Due weight must be given to the state administrative

proceedings.  See id.; Abrahamson v. Hershman, 701 F.2d 223, 230

(1st Cir. 1983).

     Although the exact quantum of weight is subject to the
     district judge's exercise of informed discretion, see
     Hampton [Sch. Dist. v. Dobrowolski], 976 F.2d [48,] at 52
     [(1st Cir. 1992)];  G.D. v. Westmoreland Sch. Dist., 930
     F.2d 942, 946 (1st Cir. 1991), the judge is not at
     liberty either to turn a blind eye to administrative
     findings or to discard them without sound reason.  See
     Burlington [v. Dep't of Educ.], 736 F.2d [773,] at 792
     [(1st Cir. 1984), aff'd, 471 U.S. 359, 105 S.Ct. 1996
     (1985)]("The court, in recognition of the expertise of
     the administrative agency, must consider the findings
     carefully and endeavor to respond to the hearing
     officer's resolution of each material issue.").  In the
     end, the judicial function at the trial-court level is
     "one of involved oversight," Roland M. [v. Concord Sch.
     Comm.], 910 F.2d [983,] at 989 [(1st Cir. 1990)]; and in
     the course of that oversight, the persuasiveness of a
     particular administrative finding, or the lack thereof,
     is likely to tell the tale.

                              15

<u>Lenn v. Portland Sch. Comm.</u>, 998 F.2d 1083, 1087 (1st Cir. 1993).

In short, "the law contemplates an intermediate standard of review on the trial-court level--a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review."  <u>Id.</u> at 1086.  "[T]he procedural protections provided by the administrative process would be rendered meaningless if courts could simply substitute their own preferences for the administrative officers' evaluations."  <u>Kevin G. v. Cranston Sch. Comm.</u>, 965 F.Supp. 261, 263 (D.R.I. 1997).

## IV. Burden of Proof

Plaintiff, as the complaining party, bears the burden of proving that the hearing officer's decision was wrong.  <u>See Roland M. v. Concord Sch. Comm.</u>, 910 F.2d 983, 991 (1st Cir. 1990)(applying IDEA's predecessor, the Education of the Handicapped Act); <u>see also</u> <u>Schaffer v. Weast</u>, 546 U.S. 49, 56, 126 S.Ct. 528 (2005)("[T]he person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims."); <u>id.</u> at 57-58 (concluding in IDEA case that "[a]bsent some reason to believe that Congress intended otherwise ... the burden of persuasion lies where it usually falls, upon the party seeking relief."); <u>id.</u> at 56 (explaining meaning of "burden of proof" in IDEA case

16

as "which party loses if the evidence is closely balanced");
Barnett v. Fairfax County Sch. Bd., 927 F.2d 146, 152 (4th Cir.
1991)("[T]he party challenging the hearing officer's decision
properly bears the burden of proof in showing that the officer's
decision was erroneous."); Town of Burlington v. Dep't of Educ.
for Mass., 736 F.2d 773, 794 (1st Cir. 1984).

**V.   Discussion**

   **A.   Hearing Officer's Decision**

   The Hearing Officer found that "all of the individuals
involved in this case have gone to considerable lengths to obtain
this student's attendance at school."  Decision at 16.  She noted
that the School Department had employed a noted expert in autism
and Asperger's Syndrome (Dr. Harrison Goldman) with whom the
parties had been in constant contact.  See id.  She also noted
that in the Settlement Agreement the parties had agreed to follow
the recommendations of the expert.  See id. at 17; see also IDP
Hearing Joint Ex. 4 at 2.

   The Hearing Officer further found that:

   The parent and school personnel, including the expert[,]
   have exhausted every avenue in attempting to bring the
   student back into the classroom.  The District tried
   first to accommodate the child by placing him in the
   Learning Beyond Grade Level class, a more structured
   environment, with his peer buddy and a 1-1 aide.  When
   that placement failed, the District embarked on a plan to
   have the child educated in the school library.  The
   District went so far as to permit the student to be
   accompanied by family members and family friends while at
   school.  Still, the child did not attend school.

17

....

> There is ample evidence to demonstrate that the District modified the student's plan numerous times without any success in transitioning him from home to school.   At last, the expert determined that the student's Asperger's diagnosis is not what is preventing him from going to school.   The child has developed school phobia that prevents him from physically entering into the classroom. She determined that the child's anxiety includes school phobia as his primary diagnosis for which therapeutic intervention is required.   Dr. Harrison Goldman went so far to say that the boy needs a residential therapeutic setting.   She recommended Bradley due to its prominence in servicing children with psychiatric illness.   In deference to the parent's opposition to a residential placement, the expert then suggested the Bradley Day School, where there is still an opportunity for residential admission if the Day School is not succesful.

Decision at 16-17.

With respect to Parent's desire to send Alex elsewhere, the Hearing Officer determined that this was not realistic as both St. Andrew's and the Hamilton School believed that he was not appropriate for their programs.  <u>Id.</u> at 17.  Regarding the Wolf School, the Hearing Officer noted that there were no openings at the Wolf School and that it was not a psychiatric facility.  <u>Id.</u> The Hearing Officer also found it noteworthy that Alex (who testified briefly at the IDP Hearing) had "expressed a pre-disposition against Bradley from what he 'heard' not withstanding the fact that he never visited there."  <u>Id.</u> at 17 n.4.  As for Parent's request for home tutoring, the Hearing Officer found that "[a]ll of the witnesses, with the exception of the parent, agree that home tutoring would not be beneficial to addressing

[Alex]'s illness."  Id. at 17.

In reviewing the evidence, the Hearing Officer discussed Dr. Younes' opinion that Bradley would not be an appropriate placement for Alex and that Dr. Younes had based this opinion on her knowledge of the type of children attending Bradley, i.e., children with behavior problems.  Id. at 18.  The discussion recounted Dr. Younes' belief that Bradley would not provide Alex with his academics.  Id.  The Hearing Officer noted, however, that Dr. Younes admitted that she had not been to Bradley recently and was basing her opinion upon the knowledge she gained from her other patients who were placed there.  Id.  The Hearing Officer also noted that Dr. Younes did not suggest an alternative class setting for Alex.  Id.

Against Dr. Younes' opinion, the Hearing Officer weighed the contrary views of Dr. Harrison Goldman, Dr. Greta Francis ("Dr. Francis"), the clinical director of Bradley,[18] and Dr. Lisa Freda ("Dr. Freda"), a senior psychologist at Bradley, all of whom "testified that there were numerous students at Bradley with [Alex]'s diagnosis."  Id.

> They further testified that Bradley would focus on therapeutic intervention to develop coping strategies that the student could rely upon in times of stress. Without these coping strategies, the student will never overcome his anxiety sufficiently to attain academic

---

[18] Dr. Francis testified that she is also an associate professor of psychiatry and human behavior at Brown University.  Tr. 3/5/09 at 4.

> progress.  Regarding the academics provided at Bradley,
> Dr. Francis testified that there are 8 or less students
> per class, and that academic programs are individually
> tailored to each student's capabilities.  All three
> witnesses testified that Bradley has achieved great
> success in treating students like [Alex] and
> transitioning them back to public school settings.

Id.

> Summing up her findings, the Hearing Officer wrote:

> The parties agreed to the entry of a federal Court
> Order that provided that the Court appointed expert would
> set the parameters of [Alex]'s education.  In this case,
> the expert has exhausted the educational programs along
> the continuum from the least restrictive mainstream
> placement to her decision of a therapeutic day school
> placement.  She has testified that is what is minimally
> necessary in order for the child [to] develop coping
> strategies that will allow him to make academic progress
> and transition to the public school setting.

Id. at 19.

The Hearing Officer concluded that Bradley was the least
restrictive environment in which Alex could make academic
progress.  Id.  Accordingly, the Hearing Officer denied Parent's
complaint that Bradley was not a FAPE for her son and also her
complaint for home tutoring.  Id.

   **B.  Plaintiff's Arguments**

        **1.  Performance of Dr. Harrison Goldman and School
Department with respect to Alex's transition to Middle School**

   Plaintiff contends that Dr. Harrison Goldman failed to
properly perform her duties as the court-appointed expert and
that the School Department failed to properly transition Alex
into the Middle School.  See Plaintiff's Memorandum in Support of

20

His Motion for Summary Judgment and in Support of His Motion in
Opposition to Defendants' Motion for Summary Judgment
("Plaintiff's Mem.") at 3-9; see also PSUF ¶¶ 56-71 (alleging
facts relevant to these issues); Plaintiff's Statement of
Disputed Facts (Doc. #17) ("PSDF") ¶¶ 4, 11, 19 (same).
However, the issue with respect to Count 1 is whether, pursuant
to the IDEA, Bradley is an appropriate placement for Alex and, if
it is not, whether he should receive home tutoring until an
appropriate placement can be found.  See Complaint ¶ 69-70.  The
Hearing Officer stated at the outset of the hearing that this was
the issue, and Plaintiff voiced no objection to her framing it
so.[19]  Tr. 3/4/09 at 3; cf. Sellers v. U.S. Dep't of Defense,
C.A. No. 07-418S, 2009 WL 559795, at *11 (D.R.I. Mar. 4, 2009)
(finding that plaintiff's "failure to respond to the framing of
the issue supports a finding that [p]laintiff did not exhaust her
administrative remedies with respect to the hostile work

_____

[19] The Hearing Officer framed the issue as reflected below:

We are proceeding today on the issue of whether the placement
proposed by the department is appropriate.
    The petitioner has alleged it is not.  It is the
petitioner's parents' [sic] burden to establish that the
proposed placement by the district, which is [the] Bradley
Hospital Day School, is not appropriate for the student.

Tr. 3/4/09 at 3.  In the course of his opening statement, which
followed the Hearing Officer's framing of the issue before her,
Plaintiff's counsel stated that "we feel Bradley is an inappropriate
placement, and that until an appropriate placement is found that Alex
should be home-schooled, not home-schooled, tutored at home."  Id. at
11-12.

environment claim"); Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1325 n.7 (2nd Cir. 1990)("By failing to object, defendant denied the [c]ourt below an opportunity more precisely to frame the issues involved.").  In fact, Plaintiff agrees that the issue before the Hearing Officer was "whether the proposed placement of Alex at Bradley Day School is appropriate."  Plaintiff's Mem. at 2; id. at 16 ("The issue is whether the placement proposed by Lincoln, Bradley, is an appropriate placement.").

Accordingly, with respect to Count I, Plaintiff waived the issues of whether Dr. Harrison Goldman performed her duties under the Settlement Agreement properly and whether the School Department properly transitioned Alex into the Middle School.[20] See J.M v. East Greenwich Twp. Bd. of Educ., Civil Action No. 07-2861 (NLH), 2008 WL 819968, at *3 (D.N.J. Mar. 25, 2008) ("failure to raise an issue at the administrative level will result in a waiver of the issue in a civil action before a federal district court"); Royal Towing, Inc. v. City of Harvey, No. 03 C 4925, 2005 WL 1563198, at *4 (N.D. Ill. June 24, 2005) ("Generally, a failure to object at the original hearing waives the right to raise the issue on appeal."); Moubry v. Indep. Sch. Dist. No. 696(Ely), 951 F.Supp. 867, 886 (D. Minn. 1996)(finding issue waived by plaintiff's failure to preserve claim at

---

[20] The Court makes no determination as to whether the waiver applies to the remaining counts of the Complaint.

administrative level); <u>Ciresoli v. M.S.A.D.</u>, 901 F.Supp. 378,

385-86 (D. Me. 1995)(declining to reach issue of home-based

support services because it was not presented at the

administrative hearing); <u>Drinker v. Colonial Sch. Dist.</u>, 888

F.Supp. 674, 679 (E.D. Pa. 1995)("Pursuant to IDEA, failure to

raise an issue at the administrative level will result in waiver

of that issue on appeal ...."). <u>But see</u> <u>Laddie C. v. Dep't of</u>

<u>Educ.</u>, CV No. 08-00309 SOM/BMK, 2009 WL 855966, at *6 (D. Haw.

Mar. 27, 2009)(remanding to hearing officer to rule on matters

not properly presented to him even though plaintiff "could

arguably be said to have waived the issue").[21]

To remove any doubt that the issue of whether placement at

Bradley constitutes a FAPE for Alex is different from the issues

of whether Dr. Harrison Goldman performed her duties properly and

whether the School Department properly transitioned Alex into the

Middle School, the Court makes the following observation.  Even

assuming that Dr. Harrison Goldman did not perform her duties

---

[21] <u>Laddie C.</u> is readily distinguishable from the instant matter.
In <u>Laddie C.</u>, it was not clear whether anyone at the final IEP
meeting, which recommended that the student be transferred from a
private special education school to a neighborhood public school, knew
the child outside of his father and the father's representative.
<u>Laddie C. v. Dep't of Educ.</u>, CV No. 08-00309 SOM/BMK, 2009 WL 855966,
at *6 (D. Haw. Mar. 27, 2009).  While the court otherwise affirmed the
hearing officer's findings, it remanded to the hearing officer "the
issues of when the placement decision was made, who was involved in
that decision, and whether those persons were sufficiently
knowledgeable." <u>Id.</u>  In the instant matter, the record is absolutely
clear that the persons participating in the IEP meetings were very
familiar with Alex.  They had been struggling for more than two months
to find a way to get him into the classroom.

properly and that the School Department failed to transition Alex properly into the Middle School, Bradley could still be an appropriate placement.  Conversely, even if both Dr. Harrison Goldman and the School Department acted flawlessly with respect to the transition process, Bradley could still be an inappropriate placement.  While Plaintiff believes that Dr. Harrison Goldman and the School Department are responsible for Alex's unsuccessful transition to the Middle School and appears to seek to have the Court weigh their alleged failures against Defendants in determining whether Plaintiff has met his burden of showing that placement at Bradley does not constitute a FAPE, the Court declines to do so as the issues are separate.

### 2.  Violation of IDEA re IEP meeting

Plaintiff also asserts that Defendants violated the IDEA when they did not set up an IEP meeting to discuss the change in placement for Alex.  <u>See</u> Plaintiff's Mem. at 11.  Again, this was not identified as an issue before the Hearing Officer. Accordingly, the Court finds that Plaintiff has waived this issue for the same reasons stated in the previous section.

Even if the Court were to overlook Plaintiff's waiver, the record supports Defendants' position that Alex's placement at Bradley was discussed at multiple IEP meetings, that Parent expressed her opposition to such placement, that in deference to her wishes the School Department sent information about Alex to

the three schools which Parent wanted considered, St. Andrew's, the Hamilton School, and the Wolf School, and that these schools either concluded that Alex was not appropriate for their programs or did not have an opening.  See, e.g., Tr. 3/5/09 at 62-63 (Ms. Jones testifying that at the November 24 IEP meeting they discussed the two placements that the School Department had visited, Bradley and Mount Pleasant Academy ("Mount Pleasant"), that she felt Bradley was more appropriate, and that a decision was made that Bradley was going to be the recommended placement); Tr. 3/12/09 at 34-35 (Parent testifying that between the IEP meetings on November 12 on November 24 she visited Bradley, Mount Pleasant, St. Andrew's, and the Wolf School); Tr. 3/11/09 at 41-42 (Ms. Maher testifying that at the November 24 IEP meeting Parent talked about some of the schools which she had visited and that the team made a decision to recommend Bradley).  This is not a case where Parent did not have input into the placement decision or was denied participation in the placement process. Cf. Laddie C., 2009 WL 855966, at *4 ("[T]he mere existence of a difference in opinion between a parent and the rest of the IEP team is not sufficient to show that the parent was denied full participation in the process ....").  Parent visited Bradley with Kathie Toner-Walkden[22] ("Ms. Toner-Walkden") and another friend,

---

[22] Ms. Toner-Walkden is a licensed clinical social worker who is a friend of Parent.  See Tr. 3/12/09 at 3-4.  Ms. Toner-Walkden has worked "with adolescents, mostly in middle school, with a range of

met with its director, Dr. Francis, and had a tour of the building  Tr. 3/12/09 at 35.

Plaintiff complains that the Decision "does not make it clear when the decision to place Alex at Bradley occurred." Plaintiff's Mem. at 11.  However, the following facts are reasonably clear from the record.  Dr. Harrison Goldman recommended residential placement in her October 27, 2008, letter.  <u>See</u> IDP Hearing Joint Ex. 21 at 2.  This recommendation was discussed at the IEP meetings held on November 12 and 24, 2008 (and also possibly at the November 10, 2008, meeting).  <u>See</u> Tr. 3/12/09 at 31 (Parent testifying that she recalls four IEP meetings, one in October and three in November, and that residential placement was brought up on November 10 or 12); <u>id.</u> at 17-18 (Mr. Applebaum testifying that it is fair to say that residential placement was discussed on November 12 and 24). Parent was very upset by the recommendation for residential placement.  Tr. 3/12/09 at 31-32 (Parent testifying that she "was very upset and distraught"); Tr. 3/11/09 at 13 (Ms. Jones testifying that Parent and Mr. Applebaum were very upset by the recommendation for residential placement); Tr. 3/4/09 at 70 (Ms. Maher testifying that "within that [i.e., November 10 or 12], the

_____

issues, drug issues, post-traumatic stress issues, suicidal kids, death, and all kinds of urban problems." <u>Id.</u> at 4.  She testified that she had attended many school meetings with Parent during the previous two years.  <u>Id.</u> at 5.

first meeting ... [Parent] became visibly upset when the
recommendation was heard about a residential placement"); Tr.
3/5/09 at 82 (Dr. Harrison Goldman testifying that Parent and her
advocates were "very unhappy" with the recommendation).

In response to Parent's strong opposition, the IEP Team
agreed to recommend day placement.  Tr. 3/4/09 at 72-73 (Ms.
Struble testifying that "because [Parent] was so upset about a
residential placement ... we could ... try Bradley Day School
first"); Tr. 3/11/09 at 13 (Ms. Jones testifying that "we tried
to compromise by saying a day therapeutic program then"); Tr.
3/11/09 at 38-39 (Ms. Maher testifying that "mom was very
distraught ... [s]o although I completely understood a
residential placement recommendation, we recommended ... a day
school setting"); Tr. 3/5/09 at 83 (Dr. Harrison Goldman
testifying "there was a lot of discussion about ... a day
treatment placement ... versus going directly to residential
placement ... I was willing to go along with the team ... as a
team decision"); Tr. 3/12/09 at 34-35 (Parent testifying that
between November 12 and 24 she visited Bradley, Mount Pleasant,
St. Andrew's, and the Wolf School); id. at 37 (Parent testifying
that no decision was made on November 24 other than that the
placement would be out-of-district and a day school); id. at 46-
47 (Parent testifying that the School Department did not state to
her at the end of the November 24th meeting that Bradley was to

27

be the placement); id. at 47 (Parent testifying that she did not learn until January 17, 2009, that the School Department had decided to place Alex at Bradley).

It is true that there is some uncertainty and/or conflict among the witnesses as to the precise date that Bradley became the recommended placement.  See Tr. 3/5/09 at 84, 109 (Dr. Harrison Goldman testifying that Bradley was discussed on November 24th and "Bradley was the primary choice, but I'm not sure if that was the final decision at that point, or not"); Tr. 3/4/09 at 73 (Ms. Struble testifying that it was determined at the November 24th meeting that if Bradley could be secured it would be the proper placement); Tr. 3/11/09 at 42 (Ms. Maher testifying that a decision was made at the November 24th meeting "[f]or a day placement setting, and we were recommending the Bradley School"); Tr. 3/12/09 at 18 (Mr. Applebaum testifying that what was discussed at the November 24th meeting "was the fact that [Alex] would have to be placed in an all-day program outside of the public school district"); Tr. 3/12/09 at 7-8 (Ms. Toner-Walkden testifying that "[t]here was [sic] so many meetings during that time, I'm not sure which one was which, but it was brought up towards, I think it might have been the 14th of November that it was supposedly going to be recommended that he do out-of-school placement.  Dr. [Harrison] Goldman was the one who recommended that.  She said residential, and we talked about

28

Bradley and several other schools and we were asked to look at certain schools, [Parent] was asked and then she agreed to do so, and I accompanied her to Bradley").

The record, however, also contains the December 22, 2008, letter from Ms. Struble to Parent.  See IDP Hearing Joint Ex. 40 (Letter from Struble to Parent of 12/22/08).  The letter begins by stating that the IEP Team "met last on November 24, 2008," id. at 1, that "[t]he meeting was the culmination of multiple meetings regarding Alex," id., and that "[t]he team recommended an out of district placement," id.  Thereafter, the letter recounts what lead up to the decision to recommend this placement:

> All attempts of the IEP Team (including family, teachers, service providers, administrators and the court appointed expert) have not met with success.  This refusal to attend school is despite multiple meetings with the Court appointed expert, a transition plan developed by the Court appointed expert, various modifications of his schedule, and access to multiple family members, friends, and service providers during the course of the school day.  Alex continues to refuse to attend school or participate in academic activities within the current placement.  Pursuant to a Court Order, the Court appointed expert issued a recommendation suggesting an out of district placement.  At a meeting, **the expert recommended, and a consensus of the team agreed, that a placement such as Bradley Day School or Mount Pleasant Academy would be appropriate to meet Alex's needs.**  The Team also considered several out of district schools proposed by yourself including: The Wolf School, St. Andrews, and The Hamilton School. The team rejected St. Andrews[] and The Hamilton School as possibilities because the programs would not meet Alex's needs at this time.  These are not the type of therapeutic programs that the expert and team feel is necessary.  The Wolf School is not such a program either, and it does not have

openings at this time.

After visiting several programs and multiple meetings,
the IEP Team has recommended an IEP with placement at the
Bradley Day School to meet Alex's needs.  We have
scheduled an intake meeting for this placement at the
Bradley Day School for Wednesday, January 14, 2009, at
1:30 p.m.  Alex will begin school in this placement
following this meeting.  The tutoring arranged for Alex
at the middle school will remain available until this
meeting.

Id. at 1-2 (bold added)

It is true that Parent testified that she never received

this letter and was unaware of the meeting at the Bradley School

on January 14, 2009.[23]  See Tr. 3/12/09 at 49.  However, the

Court views the letter as documenting how matters stood as of the

conclusion of the November 24, 2008, IEP meeting, namely that the

team was recommending an out-of-district placement at either the

Bradley Day School or Mount Pleasant Academy.  IDP Hearing Joint

---

[23] Exactly when Parent learned that the Bradley Day School was the
IEP Team's recommended placement is not entirely clear from her
testimony.  See Tr. 3/12/09 at 47-49.  She refers to a meeting on
January 16, 2009, at which Ms. Struble told her that she had been sent
a letter and then states that she received a letter on Saturday,
January 17, 2009.  See id. at 48.  Presumably, that letter is IDP
Hearing Joint Ex. 43 (Letter from Struble to Parent of 1/15/09).  The
opening paragraphs of this letter state:

As you know, the IEP Team recommended an IEP with placement at
the Bradley Day School to meet Alex's needs.  We notified you
by letter (dated December 22, 2008) of the intake meeting
scheduled for January 14, 2009, at 1:30 p.m. for this
placement but you did not attend this meeting.

The meeting took place in your absence and a placement has
been secured.  You will need to arrange a time to complete
your portion of the paperwork with Dr. Greta Francis at The
Bradley Day School.

Id.

30

Ex. 40 at 1.  Parent knew by that date that the Bradley Hospital

Day School program was under strong consideration by the IEP

Team.  See Tr. 3/12/09 at 46.  She had visited both Bradley and

Mount Pleasant Academy, see id. at 34-35, and she had voiced her

opinion that Bradley was not an appropriate placement, see id. at

46.  While the record does not explicitly reflect that Parent

also voiced her opinion of Mount Pleasant Academy at the November

24 IEP meeting,[24] given that she found her visit to that facility

"very scary," Tr. 3/12/09 at 36, it seems improbable that she

would not have done so.

   While it is regrettable that Parent did not receive notice

of the January 14, 2009, meeting, there is no reason to believe

that reiterating her opposition to the Bradley Hospital Day

School would have resulted in a different placement

recommendation by the IEP Team.  Cf. Laddie C., 2009 WL 855966,

at *4 ("[T]he mere existence of a difference in opinion between a

parent and the rest of the IEP team is not sufficient to show

that the parent was denied full participation in the process, nor

that the [Department of Education]'s determination was

incorrect.").  Accordingly, even if Parent had not waived this

issue before the Hearing Officer, this Court would decline to

find a violation of the IDEA.  Given the totality of the

---

[24] The record does reflect that Dr. Harrison-Goldman testified
that Parent was unhappy with all of the placements discussed at the
November 24, 2008, IEP meeting.  See Tr. 3/5/09 at 109.

31

circumstances surrounding the recommended placement, the Court is unable find that Defendants violated the IDEA in their conduct of the IEP meetings.

### 3.  Weight Given to Dr. Harrison Goldman's Opinion

Plaintiff argues that the Hearing Officer gave too much weight to the opinion of Dr. Harrison Goldman as it applied to out-of-district placement.  <u>See</u> Plaintiff's Mem. at 17.  While the Hearing Officer's statement that the Settlement Agreement "specifies particularly the appointment of an expert who was to dictate the terms of the student's education," Decision at 16-17, overstates matters, the Hearing Officer could properly give very significant weight to Dr. Harrison Goldman's opinion.  As the Hearing Officer accurately noted, Dr. Harrison Goldman was a noted expert in autism and Asperger's Syndrome and had been in extensive contact with school personnel.  Decision at 17; <u>see also</u> Settlement Agreement at 1 (describing Dr. Harrison Goldman as "a noted and agreed upon expert in the field of autism, specifically Asperger['']s Syndrome ....."); Tr. 3/5/09 at 77 (Dr. Harrison Goldman describing her contact with school personnel as "[d]aily, if not multiple times during the day").

After Alex reached the point of being physically unable to enter a classroom, Dr. Harrison Goldman came to the conclusion that the School Department had done everything possible to transition Alex into the Middle School and that he required

placement at a therapeutic facility.  Id. at 84-85.  Given Dr.
Harrison Goldman's expertise and her familiarity with Alex and
the School Department's efforts to get him into the classroom,
the Court cannot say the Hearing Officer erred in giving
significant weight to the expert's opinion.

### 4.  Additional Arguments

Plaintiff faults the Hearing Officer for accepting
Defendants' position that Alex is unable to attend school because
of his school phobia and that his Asperger's is only a secondary
concern.  See Plaintiff's Mem. at 11.  However, the record
reflects that the educational experts were in agreement on this
point.  See Tr. 3/5/09 at 80 (Dr. Harrison Goldman testifying
that Alex has "school phobia and it was more of the emotional
component that was keeping him from actually participating in the
classroom environment, not necessarily the Asperger's
diagnosis"); Tr. 3/4/09 at 95 (Ms. Struble noting the "crucial
needs that Alex has, the anxiety, school refusal and the
Asperger's"); 3/11/09 at 12 (Ms. Jones testifying that "the
anxiety is what's stopping him from getting into the room"); see
also Tr. 3/12/09 at 42-43 (Dr. Freda testifying that Bradley has
students "with a history of [school] phobia and school refusal");
Tr. 3/5/09 at 13 (Dr. Francis testifying that success at Bradley
"is helping kids to be able to come to school, cope with whatever
anxieties or nervousness they have about school and be able to do

33

their academic work and function in the classroom").

Plaintiff also argues, in effect, that the Hearing Officer should have accepted the opinion of Dr. Younes that Bradley is not an appropriate placement for Alex because being in a class with students with behavior problems would increase his anxiety. See Tr. 3/27/09 at 14-17 (Dr. Younes so testifying). However, Dr. Younes is a pediatric neurologist, not an educator. Id. at 3. Given that courts should recognize the expertise of educators with respect to efficacy of educational programs, see C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 289 (1st Cir. 2008) (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County, 458 U.S. at 207-08), this Court cannot find that the Hearing Officer erred in deciding to accept the opinions of the educators in deciding whether Bradley constituted a FAPE.

At most, the best that can be said for Plaintiff's position in this case is that evidence supported competing viewpoints regarding whether Bradley was an appropriate placement.[25] This is not sufficient for the Court to find that the Decision of the Hearing Officer should be overturned. See id. at 281 n.1 (noting district court acted appropriately in giving "due deference to the hearing officer's determinations").

_____

[25] Defendants accurately note that "[w]ith the exception of Parent and Dr. Younes, every witness who testified about Bradley definitively stated that it was appropriate." Defendants' Memorandum of Law in Support of Its Motion for Summary Judgment on Count 1 of Plaintiff's Complaint ("Defendants' Mem.") at 10.

###### 4.  Home Tutoring

Plaintiff asserts that the tutoring offered by Defendants
was not appropriate "as this whole case is about Alex's refusal
to attend school in Lincoln.  If he is afraid to attend school in
Lincoln, why would he come for tutoring sessions at the place he
is afraid to come to[?]"  Plaintiff's Mem. at 20.  However, the
testimony indicates that Alex's greatest difficulty came in
trying to physically enter a classroom.  He was, in fact, able to
function to some extent in the library or other locations on the
days he came to school.  The evidence in this case, as well as
the Court's own common sense, compels the conclusion that
tutoring Alex at home would only further increase his school
phobia.  <u>See</u> Tr. 3/5/09 at 87 (Dr. Harrison Goldman stating that
this would be "reinforcing ... the school phobia").  Even Dr.
Younes agreed that home tutoring would not be "optimal," Tr.
3/27/09 at 15, and allowed that "if they could do the home
tutoring at school in a routine manner, in a caring manner where
everybody knew what they were doing and it was predictable,
probably, that would be ideal because then he'll still be within
a school environment," <u>id.</u> at 17.  Based on this record, the
Court finds that the Hearing Officer's denial of Parents'
complaint for home tutoring is amply supported by the evidence.

## VI.   Summary

Plaintiff waived the issues of whether Dr. Harrison Goldman properly performed her duties under the Settlement Agreement and whether the School Department properly transitioned Alex into the Middle School by not objecting to the Hearing Officer's framing of the issue at the outset of the IDP Hearing.  For the same reason, Plaintiff similarly waived any claim based on an alleged violation of the IDEA with respect to an IEP meeting.  The Hearing Officer's decision to accept the opinion of the educational experts, including that of the court-appointed expert, that placement at Bradley was appropriate and to reject the contrary opinion of Dr. Younes was reasonable and supported by evidence in the record.  At most, the evidence in this case supported competing viewpoints regarding whether Bradley was an appropriate placement.  In such circumstances, Plaintiff has not met his burden of proving that the Hearing Officer's decision was wrong.

## VII.  Conclusion

For the reasons stated above, I recommend that Defendants' Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific

objections in a timely manner constitutes waiver of the right to
review by the district court and of the right to appeal the
district court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>,
792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford</u>
<u>Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ David L. Martin</u>
DAVID L. MARTIN
United States Magistrate Judge
January 25, 2010